IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 2, 2018

**IN RE BRIANA H., ET AL.**

**Appeal from the Juvenile Court for Hickman County**
**No. 17-JV-197      Amy Cook Puckett, Judge**

_____

**No. M2017-02296-COA-R3-PT**
_____

Mother appeals from the trial court's order terminating her parental rights. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J.,M.S., and JOHN W. MCCLARTY, J., joined.

Gary W. Wicks, Sr., Franklin, Tennessee, for the appellant, Tiffany H.

Herbert H. Slatery, III, Attorney General and Reporter;  Erin A. Shackelford, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

Thomas H. Miller, Nashville, Tennessee, Guardian Ad Litem.

**OPINION**

**Background**

The children at issue in this case, Briana H. and Dakoda F., were born in September 2006 and August 2013, respectively.[1] Briana and Dakoda are the non-marital children of Petitioner/Appellant Tiffany H. ("Mother") and Steven F. ("Father").  Father is not a party to this appeal. Briana and Dakoda first came to the attention of the Tennessee Department of Children's Services ("DCS") on January 11, 2016, after DCS

---

[1] In cases involving termination of parental rights, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

received a referral alleging the following: that Mother was using methamphetamine while the children were in her custody, that Mother had recently attempted suicide after a twenty-eight day methamphetamine binge, that Dakoda was being physically abused by Mother, and that Mother was exposing the children to registered sex offenders. At the time, Mother lacked a permanent home; she and the children were living with Mother's sister in Hickman County, Tennessee. The children were removed from Mother's custody by DCS on January 14, 2016, and were placed in the custody of a maternal aunt and uncle.

On January 28, 2016, the Hickman County Juvenile Court entered an order transferring the children to temporary DCS custody, finding that the maternal relatives could no longer care for the children and that no less drastic alternative existed. The court entered a permanency plan on February 16, 2016, the primary goal of which was "return to parent." This plan addressed the initial reasons for removal, namely, Mother's substance abuse, Mother's ongoing mental health issues, the lack of safe, permanent housing for Mother and the children, issues of domestic violence, and the abuse allegations with regard to Dakoda. The permanency plan required the following of Mother: (1) complete in-patient drug and alcohol treatment and follow all after-care recommendations that result; (2) submit to and pass random drug screenings by DCS; (3) identify a sponsor and attend twelve step meetings following Mother's release from treatment; (4) obtain stable housing and maintain housing in a drug-free manner uninterrupted for a period of four months; (5) ensure that the children have no contact with Mother's father or brother, who were both registered sex offenders; (6) complete parenting classes; (7) complete a mental health intake with a mental health provider and follow all recommendations that result; (8) take all medications prescribed for her mental health issues and submit to pill counts by DCS; (9) complete domestic violence counseling; and (10) provide DCS with proof of completion of all tasks.

Following the entry of the permanency plan, the juvenile court held an evidentiary hearing and eventually entered an order adjudicating the children dependent and neglected on March 24, 2016. In the order, the juvenile court made the following findings: (1) Mother admitted to abusing methamphetamine and cocaine; (2) Mother admitted to being addicted to methamphetamine and cocaine; (3) track marks were observable on Mother's arms, despite Mother's denial of the use of needles; (4) Mother admitted to using methamphetamine as recently as January 11, 2016; (5) Mother admitted to striking Dakoda with a switch, although she could not remember the incident due to being under the influence of methamphetamine at the time, and was told of the incident by someone else; (6) Mother was homeless; and (7) Mother attempted to take her own life on January 3, 2016, and was still suffering from suicidal ideations. Importantly, the juvenile court also found that DCS had offered Mother a referral to the Open Door program in Nashville, a program in which the children could accompany Mother while she underwent treatment. Mother, however, refused this offer. The permanency plan from

February 16, 2016 was incorporated by reference into the final order of adjudication and disposition.

By all accounts, Mother had some initial success in complying with some requirements in the permanency plan. On January 21, 2016, shortly after the removal of her children, Mother began a twenty-eight day treatment program at Buffalo Valley. After completion of the program, Mother reported feeling "positive and great." As follow-up to her treatment, Buffalo Valley recommended that Mother attend alcoholics anonymous ("AA") and narcotics anonymous ("NA") meetings, locate a permanent sponsor, continue with mental health treatment, and locate housing conducive to recovery. After leaving Buffalo Valley on February 19, 2016, Mother was able to rent a trailer in Hickman County that was near the homes of her sister and father. For a short period of time, Mother successfully paid rent on the trailer. Mother also passed a drug screen that was administered to her on April 18, 2016. During this time, Mother was allowed to exercise eight hours per month of therapeutic visitation with the children.

Soon after acquiring housing, however, Mother relapsed and failed a drug screen that was administered on May 25, 2016. The drug screen showed that Mother was positive for cocaine, opiates, and oxycodone, although Mother maintained that she was prescribed the opiates and oxycodone through a pain clinic.[2] While Mother passed another drug screen on June 8, 2016, she subsequently failed a test administered on July 18, 2016, testing positive for benzodiazepines. Mother then tested positive for methamphetamine on August 30, 2016.

In addition to her drug screens, Mother was required to attend therapy sessions pursuant to both the permanency plan and the follow-up recommendations of Buffalo Valley; however, Mother failed to attend numerous appointments at Centerstone Mental Health ("Centerstone"). The record reflects that between the entry of the initial permanency plan and the end of October 2016, Mother either cancelled or failed to attend at least ten appointments at Centerstone. As a result of Mother's relapse and her failure to adequately address her mental health issues, the juvenile court determined that a revised permanency plan was necessary. DCS created a new plan on September 20, 2016; Mother's goals and action steps under the new permanency plan remained the same. Mother was provided with and signed the "Criteria for Termination of Parental Rights" on September 20, 2016, indicating that she received a copy and understood the contents. On October 4, 2016, the court ratified the new plan with the added permanency goal of adoption.

Mother's situation continued to deteriorate after the revised permanency plan was created. By the end of September 2016, Mother was evicted from her trailer for nonpayment of rent and was sleeping in her car or staying with friends. While Mother

---

[2] Mother never provided documentary proof of her prescription.

made a second attempt at in-patient drug treatment in November of 2016, she was discharged from Bradford Health Services after only twelve days due to problems with her insurance. Records from this treatment center indicate that Mother was diagnosed with severe amphetamine-type substance use disorder, as well as severe opioid use disorder, and was referred to Health Connect America ("Health Connect") for continuing individual sessions and meetings. Mother's Health Connect records reflect that her attendance was inconsistent; over a six month span, Mother attended three treatment sessions, but cancelled or failed to attend six sessions. Mother rescheduled her initial intake at Health Connect four different times.

On March 7, 2017, the juvenile court found that Mother was noncompliant with her permanency plan at the annual permanency hearing. The court determined that Mother was sleeping in her car at that time, and had failed to take any drug tests since her last court appearance on January 17, 2017. Moreover, Mother cancelled a hair follicle drug screen scheduled by DCS. In the permanency hearing order, the court noted that DCS would proceed with termination if the goals of the permanency plan could not be achieved within six months. However, Mother again tested positive for methamphetamine on March 17, 2017, and the children's guardian ad litem then filed the petition for termination on March 24, 2017. DCS responded by joining in the petition and requesting that it be granted.

The termination petition listed three statutory grounds as the basis for termination of Mother's parental rights: (1) substantial noncompliance with the permanency plan; (2) persistence of conditions; and (3) failure to manifest a willingness and ability to assume custody or financial responsibility for the children. Additionally, the petition averred that termination of Mother's parental rights was in the best interests of the children. In response, Mother filed an answer denying both the grounds for termination and the allegation that termination was in the children's best interests. Trial was set for July 13, 2017 and July 21, 2017, in the Hickman County Juvenile Court. Although DCS attempted to schedule a hair follicle drug screen for Mother between the filing of the petition and trial, Mother cancelled the appointment several times and the test was never completed.

At trial, the court heard extensive testimony from Mother regarding the allegations in the petition. Mother blamed her habitual drug use on a lack of family support, her ongoing depression and anxiety, post-traumatic stress disorder ("PTSD") from suffering sexual abuse as a child, the recent death of her mother, and ineffective treatment programs. Mother also denied having failed the March 17, 2017 drug screen; rather, she claimed that the test was negative and that the DCS worker administering the test failed to notice the "mysterious faint line" indicating that the test was actually negative. Mother claimed at trial that she had not abused methamphetamine since December of 2016. In response to the allegation that Mother physically abused Dakoda while on methamphetamine, Mother claimed that she only "lightly tapped" Dakoda with a switch,

although she did not deny that she was under the influence of illegal drugs when the incident occurred.

When questioned about her failure to consistently follow up with therapy or drug treatment after-care as required by the permanency plan, Mother repeatedly testified that she often could not attend meetings and appointments due to her lack of reliable transportation. Although Mother acknowledged that she knew of some transportation options through TennCare, she opined that she was unsure if this would be available to her because she had no permanent address, and thus had not explored this option. Mother also admitted that she possessed two different vehicles at various times during the pendency of this case; the first was repossessed, and the second was determined to have been stolen and was confiscated by police shortly before trial. Mother testified that she had no knowledge that the second car was stolen. At the time of trial Mother admitted that she had no vehicle and no permanent housing.

Mother also adamantly denied that DCS sufficiently aided her in locating appropriate housing for herself and her children, claiming that DCS failed to provide her with a list of resources for appropriate housing. Mother further testified that none of the housing in Hickman County was affordable, and that she was unable to apply for Section 8 housing because her social security card had been stolen. Notably, Mother admitted that during the eighteen months her children were in DCS custody, Mother declined to search for employment as recommended by DCS.

The trial court also heard from Brittney Blalock, the family service worker assigned to this case from its inception. Ms. Blalock testified that the children had been in foster care for eighteen consecutive months, and that throughout most of that time Ms. Blalock was able to stay in contact with Mother. Ms. Blalock noted that Mother did well in her efforts to comply with the permanency plan at first, but that after Mother was evicted from her trailer in September 2016, it became more difficult to communicate with Mother and that her relationship with Mother deteriorated.

According to Ms. Blalock, Mother failed to adequately address her drug addiction or mental health issues by the time of trial. Ms. Blalock stated that Mother never provided any reasons as to why she was not consistently going to out-patient treatment or her appointments at Centerstone, other than being unable to secure gas and transportation. Ms. Blalock testified, however, that Mother's alleged transportation issues did not prevent her from visiting Father in jail during February of 2017.[3]

---

[3] According to Ms. Blalock, Mother indicated to her on February 2, 2017, that Mother was, at that time, traveling to Dickson County "on Sundays" to visit Father in his drug court program. By the time of trial, Father had been expelled from drug court and was incarcerated in the Bledsoe County Correctional facility for aggravated burglary.

With regard to Mother's assertion that DCS failed to assist her in securing stable housing, Ms. Blalock indicated that she had on several occasions provided Mother with referrals to various shelters and treatment programs. At least one of the shelters suggested by Ms. Blalock was a place to which the children could have accompanied Mother. Ms. Blalock testified that at the annual permanency hearing in March of 2017, Mother refused to go to any type of homeless shelter, even one that would allow her to bring her children.

Ultimately Ms. Blalock's testimony indicated that Mother failed to complete her in-patient or out-patient drug treatment, that Mother only made herself available for one drug screen in 2017, that Mother did not complete her mental health intake, that Mother did not complete her parenting classes, and that Mother still had not procured a permanent home despite the efforts of DCS to help her do so. Ms. Blalock also testified that the children had been in the same foster home since their placement in DCS custody, and were doing well in that placement.

Following trial, the juvenile court ruled that clear and convincing evidence supported all three grounds for termination. It also determined that termination of Mother's parental rights was in the best interests of her children. The order terminating Mother's parental rights was entered on August 21, 2017, and Mother filed a timely notice of appeal on September 14, 2017.

## Issues Presented

As this Court perceives them, the issues raised by Mother's appeal are:

1. Whether DCS presented clear and convincing evidence to prove the statutory grounds for termination of Mother's parental rights under Tenn. Code Ann. § 36-1-113(g)(2), Tenn. Code Ann. § 36-1-113(g)(3), and Tenn. Code Ann. § 36-1-113(g)(14).

2. Whether the trial court erred in concluding that termination of Mother's parental rights was in the best interests of her children.

## Standard of Review

The Tennessee Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896

S.W.2d 546, 547–48 (Tenn. 1995); ***Hawk v. Hawk***, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. ***In re Angela E.***, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." ***Hawk***, 855 S.W.2d at 580 (quoting ***In re Hamilton***, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also* ***Santosky v. Kramer***, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); ***In re Angela E.***, 303 S.W.3d at 250.

***In re Carrington H.***, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at \*7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). Thus, a party seeking to terminate a parent's rights must prove (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. ***Santosky***, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); ***In re Valentine***, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***In re Carrington H.***, 483 S.W at 523–24 (citing ***In re Bernard T.***, 319 S.W.3d 586, 596 (Tenn. 2010); ***In re M.L.P.***, 281 S.W.3d 387, 393 (Tenn. 2009); ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 809 (Tenn. 2007)). Our supreme court further explains:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de

novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.,* 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.,* 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

**Discussion**

### I.     Grounds for Termination

As an initial matter, we note that Mother raises no argument on appeal with regard to grounds for termination. Under *In re Carrington H.*, 483 S.W.3d 507 (Tenn. 2016), however, this Court is tasked with reviewing each ground found by the trial court, even in the absence of a proper argument by the parent. *Id.* at 526. We therefore consider each of the three grounds found by the trial court.

#### A. Substantial Noncompliance with Permanency Plan

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), parental rights can be terminated when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4." Termination based upon this ground "requires more proof than that a parent has not complied with every jot and title of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Instead, DCS "must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *Id.* (citing *In re Valentine*, 79 S.W.3d 539, 548–49 (Tenn. 2002)). To that end, "trivial, minor, or technical deviations from a permanency plan's requirements will not be

deemed to amount to substantial noncompliance." ***In re M.J.B.***, 140 S.W.3d at 656–57. Rather, "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." ***In re Valentine***, 79 S.W.3d at 548–49.

In the case-at-bar, the trial court expressly found that the goals of Mother's permanency plans were both reasonable and related to the issues prompting removal of her children. The trial court also found, by clear and convincing evidence, that Mother was substantially noncompliant with her permanency plan. With regard to Mother's inability to stay sober and maintain stable housing, the trial court noted the following:

> At times, [Mother] was reluctant, if not outright resistant, to accept offers of help by DCS. [Mother] stipulated on March 24, 2016, in an Agreed Final Order of Adjudication and Disposition that she was offered a referral for treatment in Nashville for Open Door where she could take her children, but she refused this opportunity. When questioned about her refusal, [Mother] testified that she does not recall an offer for [sic] program. She explained that she had been up on meth for over twenty days and that drugs clouded her thinking. During one period of homelessness in 2017, [Mother] told her case manager that she would live in "no damn homeless shelter." Mother seemingly would choose pride over her children. . . . [Mother] completed in-patient treatment at Buffalo Valley in February of 2016, but she did not use the tools she gained. [Mother] obtained no sponsor. [Mother] stated that she attended a "couple" of NA/AA meetings but provided no verification of attendance to Ms. Blalock because the paper got wet. Aftercare compliance is critical to prevent relapse, and [Mother] relapsed within three months of her in-patient treatment at Buffalo Valley. . . . [Mother] did not complete intensive out-patient treatment through Health Connect America, nor did she cultivate a network of sober friends. . . . [Mother] testified that she last used meth in December of 2016. [Mother] tested positive for meth on March 17, 2017. . . . The Court questions [Mother's] credibility.

The trial court also expounded upon Mother's transportation woes, which Mother maintained was the primary reason she often did not attend drug treatment and therapy sessions:

> [Mother] stated that she had too many appointments; however, [Mother] cancelled a home visit with Ms. Blalock to take a friend and her daughter to the dermatologist in Nashville. When questioned about using public transportation, [Mother] testified that she did not use public transportation because she was not sure if she must first have a

residence from which to be picked up. She also testified that she did not call to find out more information about public transportation.

Ultimately, the trial court determined that Mother "had not tried hard enough to accomplish permanency goals," and that "she has no concrete plan for housing." Moreover, Mother "provided no proof that she had taken any steps toward her newly revealed plan for treatment."[4]

In light of the foregoing, we cannot conclude that the trial court erred in finding clear and convincing evidence to support the ground of substantial noncompliance. It should be noted that the focus of this determination is not the parent's achievement of the plans desired outcomes, but rather the parent's efforts to abide by the plan. *In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *9 (Tenn. Ct. App. June 23, 2016) (citing *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009)). Here, however, Mother's efforts were perfunctory at best. In-patient drug treatment was available to Mother on two occasions during 2016, and she tested positive for methamphetamine after discharge from both programs. Further, Mother failed to consistently attend out-patient treatment or her therapy sessions at Centerstone. Although Mother insisted at trial that she failed to attend these appointments due to transportation issues, the trial court clearly rejected Mother's testimony regarding her inability to obtain transportation. As discussed previously, "[t]he weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016). Based on the evidence before this Court, we see no reason to question the trial court's determination as to Mother's credibility. Moreover, the record reflects that despite her transportation troubles, Mother (1) visited the children's Father in jail weekly for a period of time, and (2) drove a friend and her child to a doctor's appointment in Nashville, both during the pendency of this case. Overall, Mother's actions do not reflect a serious effort to comply with the goals of the plans.

From our review of the evidence, Mother failed to complete or largely attempt the following requirements of the plans: (1) maintain stable drug-free housing for any period of time; (2) maintain sobriety; (3) participate in the recommended after-care following her stints in drug treatment; (4) provide verification of attendance at out-patient treatment and NA/AA meetings; (5) submit to random drug screens; and (6) consistently address her ongoing mental health issues. Mother's deviations from the permanency plans cannot be construed as trivial, minor, or technical; rather, the deviations are significant in light of the serious circumstances surrounding the children's removal. As such, we conclude that clear and convincing evidence supports the trial court's judgment that Mother was in

---

[4] According to Ms. Blalock, Mother contacted her the evening before trial to inform Ms. Blalock that Mother was, for the third time, going to pursue in-patient drug treatment.

substantial noncompliance with her permanency plans. The termination of Mother's parental rights based upon this ground is affirmed.

## B. Persistence of Conditions

We next consider whether DCS presented clear and convincing evidence that Mother failed to remedy the conditions that necessitated removal of her children. Pursuant to Tennessee Code Annotated section 36-1-113(g)(3), the court may terminate parental rights when a child "has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child," and

> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian; (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).

Failure to remedy the conditions which led to removal need not be willful. *In re T.S. and M.S.,* No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *6 (Tenn. Ct. App. July 13, 2000) (citing *State Dep't of Human Servs. v. Smith,* 785 S.W.2d 336, 338 (Tenn. 1990)). "A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.,* No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S.,* No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). "Where . . . efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *Id.* (quoting *In re D.C.C.,* No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

As previously discussed, this ground for termination is only applicable where the child has been removed from the custody of the parent for six months following the entry of an order of dependency and neglect. Tenn. Code Ann. § 36-1-113(g)(3); *see generally In re Audrey S.*, 182 S.W.3d 838, 874–75 (Tenn. Ct. App. 2005) (discussing the requirements of this ground for termination). In the present case, the children were adjudicated dependent and neglected by order of March 24, 2016, and remained in DCS custody for fourteen months before the filing of the termination petition on March 24, 2017. As such, there is no dispute that this ground is applicable. We therefore proceed to consider the evidence presented in support of this ground.

The trial court concluded that DCS presented clear and convincing evidence demonstrating persistence of conditions. In particular, the trial court was concerned that Mother had no plan for housing,[5] continued to test positive for cocaine and methamphetamine throughout the duration of the case, and attended mental health treatment on an irregular and inconsistent basis. Specifically, the trial court noted:

> The children have been removed from the mother's home for six months (nineteen to date) by a Court Order. . . . She is homeless today without an articulable plan for housing. [Mother] has refused in the past to take advantage of many of the resources that are at her disposal. . . . While her meth binge in January of 2016 led to [the children's] removal, the children's prolonged stay in foster care is the result of many poor decisions by [Mother] over the past year and a half. . . . The result of [Mother's] efforts are that she remains a homeless, practicing addict. . . . Mother is an addict by any reasonable measure. She has received treatment at Buffalo Valley, Bradford Health Services, and Health Connect America. Even with the benefit of such resources, she has not successfully addressed her substance abuse issues over any prolonged length of time. She has no plan, sponsor or support group for remaining clean. Meanwhile, she continues to test positive for illegal drugs, including meth.

The trial court's findings and the evidence in the record clearly and convincingly support this ground for termination. Mother failed a drug test in March of 2017, and then in June of 2017 Mother cancelled the hair follicle test scheduled by DCS. Moreover,

---

[5] In the trial court's Final Order of Adjudication and Disposition, dated March 24, 2016, the court noted that Mother was offered a referral to the Open Door Program in Nashville and declined. Additionally, at the annual permanency hearing in March of 2017, Ms. Blalock offered to help Mother get into the Nashville Rescue Mission upon hearing that Mother was once again homeless. Mother responded to this offer by stating that she would live in "no damn homeless shelter." Moreover, Ms. Blalock testified at trial that she gave Mother an application to the Renewal House, a mission where Mother would have been able to take her children. The Renewal House application was signed and dated by Mother. The record also contains flyers for Place of Hope and Buffalo Valley Shelter Resources, both of which were signed and dated by Mother.

Mother not only lacks a safe and drug-free home for the children to return to, she has no home whatsoever, for either herself or her children. Despite Mother's attendance at several rehabilitation programs, Mother does not appear to have succeeded in maintaining her sobriety for any significant length of time and appears to have a rather flippant attitude concerning the need to address these issues.[6] As the trial court aptly noted, "An addict who has been equipped and re-equipped with recovery tools cannot afford . . . to continue in the practice of addiction while her children linger in foster care." This Court agrees, and we affirm the trial court's ruling that clear and convincing evidence supports termination of Mother's parental rights pursuant to persistence of conditions.

### C. Failure to Manifest an Ability and Willingness to Personally Assume Custody

The final termination ground relied upon by the trial court is Tennessee Code Annotated section 36-1-113(g)(14):

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This statutory ground is essentially two distinct elements that must each be proven by clear and convincing evidence:

> First, DCS must prove that [m]other failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].' DCS must then prove that placing the children in [m]other's 'legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren].'

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

With regard to substantial harm, this Court has explained that:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to

---

[6] For example, the record shows that Mother missed an outpatient session at Health Connect America on December 28, 2016, and then posted to Facebook drunken photos of herself on December 31, 2016. When questioned about this at trial, Mother answered, "Who doesn't get drunk on New Year's Eve?"

precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, 2018 WL 1629930, at \*7 (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted)).

*In re Maya R.* is instructive on the matter at hand. In that case, we affirmed the trial court's ruling on this ground where the evidence showed that the mother "was living an itinerant lifestyle, residing with friends or in her car, at the time DCS filed the termination petition" that did not improve following the filing of the termination petition. 2018 WL 1629930, at \*7. The Court also noted that the mother had completed "virtually nothing required by the permanency plan until after the termination petition was filed" and failed to complete many of the plan's requirements following the initiation of the termination proceedings. *Id.* These factors led us to hold that the mother had not manifested an ability or willingness to assume custody of the child. *Id.* We also held that returning the children to the mother's custody would pose a substantial risk of harm to the child due to domestic violence and substance abuse issues that the mother "has barely begun to address[.]" *Id.* at \*8.

Returning to the case at hand, the trial court's findings on this ground are as follows:

> The Court has little confidence that the conditions which led to removal of Ms. Halbrook's children will be remedied at an early date so that the children can be returned to the mother soon. Eighteen months is a reasonable amount of time for [Mother] to get housing and to figure out how to stay clean with the resources of DCS at her disposal. She has come nowhere near close to meeting DCS halfway in trying to do what she needs to do to get her children back . . . . Mother is not compliant with her treatment for addiction. She put off going to in-patient treatment and then did not follow aftercare treatment plans. She is still homeless and addicted. [Mother] demonstrates a continued inability to provide fundamental care to Briana and Dakoda. [Mother] urges the Court to believe that much of this problem is due to circumstances beyond her control. Her actions may not be willful, and they may be the result of severe depression and addiction; however, it is unsafe to return her children to her care. Whatever the reason or excuse, [Mother] is unable to personally assume physical custody of the children: She's homeless and a practicing addict. Placing the children with her would place a risk of substantial harm to the children.

- 14 -

We agree with the trial court's conclusion that sufficient evidence was presented as to this ground. Despite the array of resources offered by DCS, Mother has been unable to personally assume custody of the children. Mother was made aware of the steps she must take in order to regain custody of her children, yet she has demonstrated a patent unwillingness to take those steps. Particularly troubling was Mother's refusal to reside in a shelter in which she would have had an opportunity to parent her children. In rejecting DCS's offer to reside in this shelter, Mother exhibited a complete unwillingness to parent her children. Thus, the evidence presented shows that throughout the months that the children have been in DCS custody, Mother manifested neither the ability nor the willingness to assume custody of her children. *See* Tenn. Code Ann. § 36-1-113(g)(14).

Moreover, the hazards that prompted the removal of Mother's children are not minor, trivial, or insignificant; on the contrary, at the time of their removal by DCS the children had no permanent home. Mother was suicidal and using methamphetamine on a daily basis. Because Mother has demonstrated little, if any, willingness to remedy these circumstances, the children would be placed at a risk of substantial harm should they be returned to Mother's custody. This Court has come to the same conclusion in a similar case. *See **In re Maya R.***, 2018 WL 1629930, at \*7 (noting that where mother continued to fail drug tests and did not complete her drug treatment, placing the children in mother's care would pose a risk of substantial harm in that the children were likely to be exposed to illegal drugs). We therefore conclude that clear and convincing evidence supports termination pursuant to Tenn. Code Ann. section 36-1-113(g)(14), and hereby affirm the ruling of the trial court.

## II. Best Interests

Having determined that clear and convincing evidence supports the statutory grounds for termination of Mother's parental rights, we now examine whether termination is in the best interests of the children. "Upon establishment of a ground for termination, the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest." ***In re Audrey S.***, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). Even where a parent is unfit, termination may not necessarily be in the best interests of the child. ***Id.***

Tennessee's termination statute lists the following factors to be used in the best interests analysis:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(1)-(9).

The Tennessee Supreme Court has explained that:

Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember

that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

*In re Gabriella D.*, 531 S.W.3d 662, 681–82 (Tenn. 2017) (internal citations omitted). Furthermore, "[a]scertaining a child's best interests does not call for a rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. The analysis requires "more than tallying the number of statutory factors weighing in favor of or against termination." *In re Gabriella D.*, 531 S.W.3d at 682 (citing *White v. Moody*, 171 S.W.3d 187, 193–94 (Tenn. Ct. App. 2004)). "The facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case," and the analysis "must remain a factually intensive undertaking." *In re Gabriella D.*, 531 S.W.3d at 682. Thus, "[d]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 878). In undertaking this analysis, the court must examine all of the statutory factors, as well as other relevant proof put forth by the parties. *Id.*

In the present case, Mother argues that the trial court erred in concluding that termination was in the best interests of her children. Mother asserts that the trial court failed to undertake the best interests analysis from the perspective of the children, and that termination was not in the best interests of Briana and Dakoda because they are not currently in a pre-adoptive home. In applying the best interest factors, we note that several factors weigh in favor of termination, while others militate against termination.

We begin with the factors that weigh in favor of termination. First, Mother has failed to make an adjustment of the circumstances, conduct, and conditions as to make it safe for the children to be in Mother's home. Tenn. Code Ann. § 36-1-113(i)(1). The primary issue in this regard is that Mother has no permanent home and has been unable to maintain sobriety for any length of time. Mother had opportunities to attend both in and out-patient drug treatment, and has nonetheless failed to maintain sobriety. Mother tested positive for illegal drugs throughout the duration of the case, and cancelled the hair follicle test she was scheduled to take in June of 2017, just before trial. Although Mother maintained at trial that she was free from drugs, the night before trial, Mother informed her DCS social worker that she was once again attempting an in-patient rehabilitation program. As such, DCS presented sufficient evidence that Mother has not made a lasting adjustment of circumstances that would make returning the children to her care possible. Mother's substance abuse remains largely unaddressed, and renders Mother "consistently unable to care for the child[ren] in a safe and stable manner." Indeed, the

fact that Mother lacks a home for the children to return to, safe or otherwise, heavily militates in favor of termination in this case.  *See* Tenn. Code Ann. § 36-1-113(i)(7).

We are likewise unpersuaded by Mother's assertion that termination was not in the children's best interests because they are not in a pre-adoptive home and hypothetically could, at some point in the future, be safely returned to Mother's care. Mother supports this argument by noting that the trial court made no finding "that the children could never be returned to [Mother] under any circumstances, only that the trial court doubted that given six months or a year anything would be different." The trial court was not, however, required to make a finding that the children can *never* be safely returned to Mother. Rather, the trial court concluded that at this juncture, clear and convincing evidence reflects that Mother cannot provide safe and stable care for the children, largely due to her substance abuse and lack of a permanent home. Tenn. Code Ann. § 36-1-113(i)(7).

Simply put, the trial court is not required to delay the possibility that the children could be integrated into safe, stable, and permanent home on the off chance that Mother will finally make improvements in her life. Here, Mother had over eighteen months to make improvements in her life. While Mother indicated at trial that she plans to seek in-patient treatment for a third time, she offered no evidence of concrete steps she has taken towards this endeavor. At the time of trial, Mother remained a homeless, likely practicing addict, and there is no indication that she will be able to establish a safe, permanent, drug-free home at any point in the near future. Mother's statement at trial of her intentions therefore constitutes the very definition of efforts that are "too little, too late." *See, e.g.,* **In re Michael**, No. M2015-02497-COA-R3-PT, 2016 WL 7486361, at *16 (Tenn. Ct. App. Oct. 6, 2016) (finding mother's efforts "too little, too late" where she had engaged in illegal activity following the filing of the petition and had only been out of drug treatment for two months by the time of trial); **In re Savannah F.**, No. E2015-02529-COA-R3-PT, 2016 WL 4547663, at *16 (Tenn. Ct. App. Aug. 31, 2016) (holding that parent's action in attending anger management in the weeks before trial was "too little, too late," where the parents continued to deny their role in the exposure to violence that the child experiences); **In re S.H.**, No. E2013-02007-COA-R3-PT, 2014 WL 1713769, at *8 (Tenn. Ct. App. Apr. 29, 2014) (holding that the parent's efforts were "too little, too late").

We also reject Mother's argument that termination cannot be in a child's best interest where there is no evidence that they are in a pre-adoptive home. Indeed, Tennessee courts have previously held that a child's alleged unadoptability was insufficient to show that termination was not in the child's best interest. *See* **State Dep't. of Children's Servs. v. D.G.B. and C.B.**, No. E2001-02426-COA-R3-JV, 2002 WL 31014838 (Tenn. Ct. App. Sept. 10, 2002) (finding that no direct evidence supported the trial court's finding of unadoptability; while the child's advanced age and mental and physical impairments might make adoption difficult, there was no proof that adoption

was impossible); *see also* **In re Seth B.**, No. E2017-00173-COA-R3-PT, 2017 WL 4082484, at \*15 (Tenn. Ct. App. Sept. 9, 2017) (rejecting father's argument that termination was not in the children's best interests because the foster parents did not indicate an interest in adopting the children, and where the evidence showed that father was incapable of caring for the children in a stable, drug-free home). Rather, "[a]doption and termination are separate inquiries." **In re Seth B.**, 2017 WL 4082484, at \*15. Here, the evidence shows that the children have been in an uninterrupted placement for the entirety of their time in foster care and that they are doing well in that home. This situation, while it may not lead to adoption,[7] is far better than what Mother could have offered in the same time frame, given her lack of income, lack of home, and significant drug issues.

Moreover, there is ample evidence in the record that DCS put forth reasonable efforts to help Mother effect a lasting adjustment of circumstances. Tenn. Code Ann. § 36-1-113(i)(2). The children were in DCS custody for eighteen months by the time trial occurred, and in that time Mother was offered referrals for housing and drug treatment, including programs that would have allowed her to take her children with her. Mental health treatment was also available to Mother through Centerstone, although her attendance at those appointments was inconsistent. While Mother insisted that she wanted to attend appointments but could not due to a lack of transportation, Ms. Blalock testified that had she been asked to do so, she could have taken Mother to some of her appointments. Tenn. Code Ann. § 36-1-113(i)(2).

The record further suggests that Mother's mental and emotional condition would be detrimental to the children, and would prevent Mother from effectively providing safe and stable care for the children. Tenn. Code Ann § 36-1-113(i)(8). Mother testified that she suffers from depression, anxiety, and PTSD, and that these conditions drive her drug addiction. One of the initial reasons the children were removed from Mother's custody was Mother's suicide attempt in January of 2016. Despite the treatment options available to her through Centerstone, Mother has not taken full advantage of that treatment. While the court is sympathetic to these issues, the fact remains that Mother's mental health prevents her from providing safe and stable care for the children, particularly because she is unwilling to address her problems. Tenn. Code Ann. § 36-1-113(i)(8).

Mother's visitation with the children during the pendency of this case was also inconsistent. Tenn. Code Ann. § 36-1-113(i)(3). The trial court noted that between January of 2017 and the trial in July of 2017, Mother saw her children only eight times, four of those instances occurring in January. By the time the trial commenced, Mother had not seen the children since April. Mother also paid no child support during the

---

[7] There was no evidence that the children in this case were "unadoptable." Rather, DCS simply failed to present evidence that the children's foster parents were willing or able to adopt the children.

pendency of this case, although she did testify that she purchased some gifts for the children. Tenn. Code Ann. § 36-1-113(i)(9).

Further, the evidence demonstrates that Mother has shown neglect towards both children and abuse towards Dakoda. Tenn. Code Ann § 36-1-113(i)(6). It is undisputed that when the children were removed, Mother was under the influence of methamphetamine and had been for nearly a month. The children were primarily being cared for by their aunt, who is also an addict and does not have custody of her own children. At the dependency and neglect hearing in March of 2016, Mother stipulated that she struck Dakoda[8] with a switch during her methamphetamine binge. However, she stated that she did not remember the incident and was told of it by someone else. Mother later disputed this admission at trial, claiming that she only "lightly tapped" him, or that perhaps Mother's sister was the one who actually struck Dakoda. It is undisputed that Dakoda had numerous bruises and scratches at the time of removal, and at trial Mother could not say who caused this due to her being under the influence of methamphetamine when the injuries occurred. Logic dictates that Mother either struck Dakoda, or was too high to discern who did.[9] Both conclusions are disturbing and reflect that Mother has shown neglect towards the children.

The two remaining statutory factors weigh more in favor of Mother. First, "whether a meaningful relationship has otherwise been established between the parent or guardian and the child." Tenn. Code Ann. § 36-1-113(i)(4). It is undisputed that Mother and children share a meaningful relationship. The trial court noted that "mother and children want to be together. The court is sympathetic to [Mother] and does not want to sever that bond." All parties agree that when Mother and the children saw one another at the permanency hearing in March of 2017, it was an "emotional" reunion.

We concede that the meaningful relationship militates against termination; Mother, however, relies too heavily upon this factor in making her argument. Mother essentially claims that the trial court failed to take into account the meaningful relationship between herself and the children, and thus could not have viewed best interests from the perspective of the children. According to Mother's brief,

> The lack of testimony presented about the current condition of the children and the fact that no testimony was sought by the trial court, even though it voiced concern, requires the conclusion that consideration of the meaningful relationship between the children and the Appellant or any other factor, whether statutory or not, was ever made from the perspective of the children when considering best interests.

---

[8] Dakoda was two years old at the time.
[9] Tennessee law recognizes that abuse can occur as a result of negligence or "inaction" of a parent, in addition to overt brutality. See Tenn. Code. Ann. § 37-1-102(b)(1).

In support of this argument, Mother cites **White v. Moody**, 171 S.W.3d 187 (Tenn. Ct. App. 2004), and **In re C.M.S.**, No. W2004-00295-COA-R3-PT, 2004 WL 2715331 (Tenn. Ct. App. 2004).

In **White**, the father was appealing the termination of his parental rights for the third time. 171 S.W.3d at 188. He and the child's mother separated before the child's birth, and father had little contact with the child in the years leading up to the filing of the petition. **Id.** at 189–90. The lack of contact was paramount in the court's decision to uphold the termination; the court pointed out that although the circumstances surrounding the lack of contact may have been outside of Father's control, this mattered little in the mind of the child. **Id.** at 194. Rather, the court noted that "what matters is that [the child] feels little connection with her father." **Id.** Ultimately, the court determined that termination of father's parental rights was in the child's best interests. **Id.** at 195.

We reached the opposite conclusion in **In re C.M.S.**, in which we determined that due to the exceptional circumstances of the case, termination of mother's parental rights was not in the child's best interest. 2004 WL 2715331, at *1. C.M.S. was a mentally handicapped child with an approximate IQ of forty-nine (49), and had been living in a therapeutic foster home for nearly six years when the termination petition was filed. **Id.** at *6. However, the child's case workers testified that mother, as well as the child's two brothers, regularly exercised visitation with C.M.S. and that the child showed happiness and affection during these visits. **Id.** at *7–*8. In light of the child's disabilities, the court determined that termination was inappropriate because it was unclear whether severing all biological family ties would cause the child to regress. **Id.** While the **C.M.S.** court afforded great weight to the relationship between mother and C.M.S., the court expressly noted that the extreme circumstances of the case made such a consideration appropriate. **Id.**

Mother's reliance on these cases is unpersuasive. While we admit that the evidence concerning the current situation of the children presented by DCS was woefully deficient, we cannot adopt Mother's argument that the trial court entirely ignored the perspective of the children in rendering its decision. A meaningful relationship is certainly an important factor in the best interests analysis. *See* **In re Addalyne S.**, No. M2017-00958-COA-R3-PT, 2018 WL 1976175, at *16 (Tenn. Ct. App. Apr. 26, 2018), *perm. app. denied* (Tenn. July 30, 2018) ("This Court has previously indicated that in some cases the lack of a meaningful relationship between a parent and child is the most important factor; it is not error for a trial court to place similar weight on the fact that such a relationship exists."). The existence of a meaningful relationship between the parent and the child, however, does not entirely foreclose the conclusion that the trial court considered best interests from the children's perspective. Nor does it foreclose the possibility that termination is in the child's best interests even where a meaningful relationship exists between the parent and the child. *Cf.* **In re Renaldo M**., No. M2016-

00472-COA-R3-PT, 2017 WL 1041541, at \*5 (Tenn. Ct. App. Feb. 7, 2017), perm. app. denied (Tenn. Feb. 7, 2017) (affirming the termination of the parent's parental rights in spite of the fact that the parent "ha[d] made a genuine effort to establish a meaningful relationship with [the children]"); *In re Holly B.C.*, No. E2012-00362-COA-R3-PT, 2012 WL 6727609, at \*12 (Tenn. Ct. App. Dec. 27, 2012) (affirming termination in spite of evidence that the children had a relationship with their parents).

The only statutory factor remaining is "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition." Tenn. Code Ann. § 36-1-113(i)(5). Here, there is simply not enough evidence in the record to determine how a change of caretaker and environment would affect the children. The only testimony as to the children's current condition came from Ms. Blalock, who testified that the children have been in the same foster home since being placed in DCS custody, and are doing well in that placement. Because DCS bears the burden to show evidence of this factor, we must conclude that this factor weighs against termination.

Considering the totality of the evidence both in favor and against termination of Mother's parental rights, we conclude that the termination of Mother's parental rights is in the children's best interest. Although the evidence is undisputed that Mother and the children have a strong bond and there is no evidence that the children would be harmed by a change in caretakers, the factors that weigh in favor of termination, particularly the complete lack of stability in Mother's life, have more weight in this particular case. We must note again, however, that we consider DCS's evidence regarding the children's current circumstances to be woefully deficient.[10] However, Mother's shortcomings were so severe that the best interest factors weighed against her as a result of her own actions. Here, it is Mother's failure to address the issues that led to the removal of the children that now militate in favor of terminating the parent-child relationship. *See State Dep't of Children's Servs. v. D.G.B. and C.B.*, No. E2001-02426-COA-R3-JV, 2002 WL 31014838, at \*8 (Tenn. Ct. App. Sept. 10, 2002) ("While the 'best interests' concept is distinct and separate from that of the concept of a ground for termination, it is clear that the concepts are related and that evidence bearing on one tends to 'bleed over' into the other."). In this situation, the minimal evidence that the children have been in a stable foster home for eighteen months and are doing well are sufficient to show that the children are simply better off in that home rather than faced with the type of home that Mother can currently provide. However, we caution DCS that had this been a closer case, the burden of proving best interests likely would not have been satisfied without DCS presenting more evidence regarding the condition of the children. Nonetheless, we affirm

---

[10] The only evidence at trial regarding the children's current condition was a mere two statements by Ms. Blalock. When asked about the children, Ms. Blalock stated that the children remained in the same foster home they were originally placed in and were doing well.

the judgment of the trial court terminating Mother's parental rights because clear and convincing evidence reflects that termination is in the best interests of the children.

**Conclusion**

The judgment of the Juvenile Court of Hickman County is affirmed. Consequently, the termination of the parental rights of Tiffany H., to her children, Briana H. and Dakoda F., is affirmed. Costs of this appeal are taxed to Appellant Tiffany H., for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE